# United States Court of Appeals
## For the First Circuit

No. 16-1771

ANDREW MARCH,

Plaintiff, Appellee,

v.

JANET T. MILLS, individually and in her official capacity as
Attorney General for the State of Maine,

Defendant, Appellant,

CITY OF PORTLAND, MAINE; WILLIAM PREIS, individually and in his
official capacity as a Police Lieutenant of the City of
Portland; JASON NADEAU, individually and in his official
capacity as a Police Officer of the City of Portland; GRAHAM
HULTS, individually and in his official capacity as a Police
Officer of the City of Portland; DONALD KRIER, individually and
in his official capacity as a Police Major of the City of
Portland,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, Chief U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

Christopher C. Taub, Assistant Attorney General, with whom
Janet T. Mills, Attorney General, and Leanne Robbin, Assistant
Attorney General, were on brief, for appellant.

Kate Margaret-O'Reilly Oliveri, with whom Thomas More Law Center, Stephen Whiting, and The Whiting Law Firm, P.A., were on brief, for appellee.

August 8, 2017

**BARRON**, **Circuit Judge**. This appeal concerns a constitutional challenge brought by a protester who opposes abortion. He seeks to enjoin the enforcement of a provision of the Maine Civil Rights Act ("MCRA"), Me. Rev. Stat. Ann. tit. 5, § 4684-B(2), that, he contends, facially violates the First Amendment's guarantee of the freedom of speech.[1] The challenged provision bars a person from making noise that "can be heard within a building" when such noise is made intentionally, following an order from law enforcement to cease making it, and with the additional "intent either: (1) [t]o jeopardize the health of persons receiving health services within the building; or (2) [t]o interfere with the safe and effective delivery of those services within the building." Me. Rev. Stat. Ann. tit. 5, § 4684-B(2)(D).

The District Court ruled that the measure restricts speech based on its content rather than on the time, place, or manner of its expression. And, the District Court concluded that the measure likely cannot survive the strict constitutional scrutiny to which such content-based speech restrictions are subject. Thus, the District Court concluded that the plaintiff was likely to succeed on the merits of his contention that the

---

[1] The First Amendment applies to Maine by virtue of the Due Process Clause of the Fourteenth Amendment. Schneider v. New Jersey, 308 U.S. 147 (1939).

measure is unconstitutional on its face and granted his request for a preliminary injunction.  We now reverse.

## I.

We begin by providing some background regarding the MCRA and the noise restriction that it sets forth.  We also describe the relevant procedural history.

## A.

The Maine legislature enacted the MCRA in 1989.  1989 Me. Legis. Serv. 582.  The MCRA creates a cause of action that the Attorney General of Maine or any "aggrieved" person may bring against any person who, "whether or not acting under color of law, intentionally interferes or attempts to intentionally interfere" with another person's rights secured by the United States or Maine Constitutions or state or federal law.  Me. Rev. Stat. Ann. tit. 5, §§ 4681, 4682.

In 1995, the Attorney General proposed a bill to amend the MCRA.  The proposed amendment sought to "add[] to the protections already contained in the [MCRA] for persons seeking services from reproductive health facilities and for persons providing services at those facilities."

The Attorney General indicated at the time that the impetus for the proposed amendment, which contained a number of distinct provisions of which this lawsuit concerns only one, was a concern that "the most extreme violence tends to occur in

- 4 -

situations where less serious civil rights violations are permitted to escalate," because "[w]hen the rhetoric of intolerance and the disregard for civil rights do, in fact, escalate, then some people at the fringes of society will take that atmosphere as a license to commit unspeakable violence." The amendment, as a whole, was thus intended to "represent[] a commitment on the part of both sides of the abortion debate to reduce tensions in order to lessen the chances of tragic violence."

In the course of the legislative process, the District Court noted, the proposed amendment was expanded "to cover conduct outside all buildings, rather than just reproductive health facilities." March v. Mills, No. 2:15-CV-515-NT, 2016 WL 2993168, at *2 (D. Me. May 23, 2016). The expansion sought to ensure that the measure would cover, in addition to "reproductive health facilities," "crisis pregnancy centers, pro-life groups' headquarters and offices, etc." Id.

A broad range of interested parties, including both proponents and opponents of abortion rights, supported the amendment. Supporters included the Maine Pro-Choice Coalition -- a coalition of twenty-five pro-choice organizations -- and the Maine Life Coalition, which consisted of the Maine Right to Life Committee, the Catholic Diocese of Portland, the Christian Civic League, and Feminists for Life of Maine.

A representative of Feminists for Life of Maine testified to the Maine legislature in support of the proposed amendment by stating that "it is the consensus of the Maine Life Coalition . . . and the Attorney General's Office that this legislation further secures protection for both pro-life and pro-choice individuals." The representative specifically noted that, "[f]or the first time in Maine and perhaps the nation, legislation has been developed with pro-life and pro-choice activists participating with the Attorney Generals' [sic] Office." In addition, a representative of the American Civil Liberties Union of Maine -- at that time known as the Maine Civil Liberties Union -- testified in support of the bill by noting that "this Act protects important constitutionally guaranteed rights, and does not in any way run afoul of the free speech provisions of the Maine and United States Constitutions."

Maine enacted the amendment in 1995. The amendment makes it a violation of the MCRA, as the District Court usefully summarized, "to interfere or attempt to interfere with a person's civil rights by: (1) physically obstructing the entrance or exit of a building; (2) making repeated telephone calls to disrupt activities in a building; (3) setting off any device that releases 'noxious and offensive odors' within a building; or (4) making noise" in a certain way and for certain reasons. March, 2016 WL 2993168 at *2 (quoting Me. Rev. Stat. Ann. tit. 5, § 4684-B(2)).

This last part of the amendment, subsection (D) of section 4684-B, is the only part of the MCRA that is at issue here. We shall refer to that part, for ease of reference, as the Noise Provision. The Noise Provision defines the "conduct," see Me. Rev. Stat. Ann. tit. 5, § 4684-B(2), that may give rise to an action under the MCRA as follows:

> D. After having been ordered by a law enforcement officer to cease such noise, intentionally making noise that can be heard within a building and with the further intent either:
>
> (1) To jeopardize the health of persons receiving health services within the building; or
>
> (2) To interfere with the safe and effective delivery of those services within the building.

Id. § 4684-B(2)(D).[2]

---

[2] The full text of the portion of the MCRA in which the Noise Provision appears reads:

> It is a violation of this section for any person, whether or not acting under color of law, to intentionally interfere or attempt to intentionally interfere with the exercise or enjoyment by any other person of rights secured by the United States Constitution or the laws of the United States or of rights secured by the Constitution of Maine or laws of the State by any of the following conduct:
>
> A. Engaging in the physical obstruction of a building;
>
> B. Making or causing repeated telephone calls to a person or a building, whether or not conversation ensues, with the intent to impede access to a person's or building's telephone

**B.**

The plaintiff in the case before us is Andrew March. He is a "co-founder of a church in Lewiston, Maine called Cell 53." March, 2016 WL 2993168 at *1. A part of the church's mission "is to plead for the lives of the unborn at the doorsteps of abortion facilities." Id. In keeping with that mission and with March's personal belief that "abortion is the killing of unborn citizens" and "harms women," March makes known his opposition to abortion outside the Planned Parenthood Health Center on Congress Street in Portland, Maine. Id.

March filed his suit pursuant to 42 U.S.C. § 1983 on December 21, 2015, in the United States District Court for the District of Maine. He named various defendants, including Maine's

---

lines or otherwise disrupt a person's or building's activities;

C.  Activating a device or exposing a substance that releases noxious and offensive odors within a building; or

D.  After having been ordered by a law enforcement officer to cease such noise, intentionally making noise that can be heard within a building and with the further intent either:

(1)  To jeopardize the health of persons receiving health services within the building; or

(2)  To interfere with the safe and effective delivery of those services within the building.

Me. Rev. Stat. Ann. tit. 5, § 4684-B(2).

Attorney General.  He alleges in his complaint that, among other things, the Noise Provision violates the First Amendment's guarantee of the freedom of speech both on its face and as applied to him.  He seeks both declaratory and injunctive relief.

More specifically, March alleges that, in November and December 2015, law enforcement on three occasions told him, pursuant to the Noise Provision, to lower the volume of his activity outside the Planned Parenthood facility in Portland.  He alleges that he repeatedly "asked for a definitive volume level that he could speak at," but did not receive a standard.  Thus, he claims, he can no longer "communicate audibly," due to fears that his speech will subject him to an enforcement action.

On December 30, 2015, March filed a motion for a preliminary injunction.  In its opposition to that motion, Maine articulated its interest in enacting the Noise Provision by emphasizing that "[p]atients have the right to receive safe and effective health care . . . without interference from Mr. March or anyone else."  Relying on affidavits from health professionals, Maine noted specifically the "physiological effect on patients, often causing additional stress and elevated blood pressure, pulse, and respiratory rates" that noise can cause when made so loud it can be heard inside a health facility, and the disruption that results to the safe and effective treatment of those patients.

Maine also challenged in its papers March's allegations about how the measure restricts speech. In particular, Maine contended that March has "yell[ed] so loudly that the patients cannot escape his rants," but that, under the measure, he remains free to express his views loudly enough to conduct conversations and be heard within the immediate vicinity, and that he has in fact done so.

The District Court heard oral argument on the motion on April 4, 2016, and received supplemental briefing. On May 23, 2015, the District Court granted March's motion for a preliminary injunction based solely on March's facial constitutional challenge, thereby leaving his as-applied challenge unaddressed.[3] In granting the requested relief on the facial challenge, the District Court applied the standard we set forth in Arborjet, Inc. v. Rainbow Treecare Scientific Advancements, Inc., 794 F.3d 168,

_____

[3] There is one other case of which we are aware that addresses the Noise Provision's constitutionality. In that case, the Attorney General, in bringing an action under the MCRA's Noise Provision, alleged that the defendant "repeatedly stood on the sidewalk" outside of the Planned Parenthood Health Center on Congress Street in Portland, Maine and "loudly yelled directly at patients inside of the facility," such that his conduct "interfered with Planned Parenthood's ability to provide medical care." The defendant in that case moved to dismiss the suit on the ground that the Noise Provision is unconstitutional on its face, but the Maine Superior Court held that the Noise Provision was a permissible time, place, or manner restriction on speech. See State v. Ingalls, No. CV-15-487, 2016 Me. Super. LEXIS 55, at *12, *14 (Me. Super. Ct. Mar. 17, 2016) (order denying motion to dismiss). No appeal was taken.

171 (1st Cir. 2015), regarding what a plaintiff seeking a preliminary injunction must demonstrate. Under that standard, a plaintiff must show: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." March, 2016 WL 2993168 at *6.

With respect to likelihood of success, the District Court first concluded that the Noise Provision is a content-based restriction on speech. The District Court explained that the Noise Provision "targets a subset of loud noise -- noise made with the intent to jeopardize or interfere [with the delivery of health services] -- and treats it less favorably." Id. at *11. And the District Court determined that the measure singled out that subset of loud noise due to its content rather than in consequence of the time, place, or manner of its expression. Id.

The District Court then ruled that, as a content-based speech restriction, the measure could survive March's facial constitutional challenge only by satisfying strict scrutiny. Id. And, the District Court explained, under that standard, a speech restriction must serve a compelling state interest through the least restrictive means. Id.

The District Court determined that Maine had a compelling interest in protecting the health and safety of its citizens, protecting its citizens from unwelcome noise around

- 11 -

medical facilities, and de-escalating potential violence that can occur around facilities that perform abortions. Id. at *12. But, the District Court ruled, "adequate content-neutral alternatives could achieve the State's asserted interest." Id. at *13. In particular, the District Court explained that Maine "could enact a law prohibiting all loud, raucous, or unreasonably disturbing noise outside of facilities providing medical care[,] . . . prohibit all noise made within a certain proximity to such facilities that has the effect of disrupting the safe and effective delivery of health care[,] . . . [or] limit all noise outside of buildings offering health services if the noise exceeds a certain decibel level." Id. (citations omitted). The District Court thus concluded that March was likely to succeed on the merits of his claim because the Noise Provision did not serve a compelling governmental interest by the least restrictive means. Id. at *14.

The District Court also concluded that the hardship to the defendants resulting from the granting of the preliminary injunction would be "minimal," whereas continued enforcement of the Noise Provision would "result in irreparable harm to [March]." Id. at *15. Finally, the District Court concluded that March "has met his burden of showing that granting an injunction to prevent continued enforcement of a content-based law would serve the public interest." Id. Accordingly, the District Court granted March's

- 12 -

motion for a preliminary injunction to enjoin the defendants from enforcing the provision. Id.

Maine has now filed this timely appeal. See 28 U.S.C. § 1292(a). Our review of the District Court's grant of the preliminary injunction on the ground that the Noise Provision is unconstitutional on its face is for abuse of discretion. Corp. Techs., Inc. v. Hartnett, 731 F.3d 6, 10 (1st Cir. 2013). We assess the underlying conclusions of law de novo and the findings of fact for clear error. Id.

## II.

The threshold question we must decide in resolving this facial constitutional challenge is whether the Noise Provision -- which restricts noisemaking even in public parks, plazas, sidewalks, or other traditional public fora, see Hague v. Comm. for Indus. Org., 307 U.S. 496, 515-16 (1939) -- is a content-based or a content-neutral speech restriction.[4] The answer matters to our analysis for the following reason.

---

[4] We bypass Maine's contention that, in accord with the MCRA's own characterization of the Noise Provision as one that targets "conduct," Me. Rev. Stat. Ann. tit. 5, § 4684-B(2), the District Court erred by not reviewing the measure under the more lenient standard of review that applies to restrictions on conduct that merely impose an incidental burden on speech. See United States v. O'Brien, 391 U.S. 367, 377 (1968) (establishing that such a restriction is permissible under the First Amendment if the restriction "is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of

- 13 -

When a restriction on speech in a traditional public forum targets the content of speech, that restriction raises the special concern "that the government is using its power to tilt public debate in a direction of its choosing." Cutting v. City of Portland, 802 F.3d 79, 84 (1st Cir. 2015). Accordingly, such content-based restrictions, to be upheld against a facial challenge, must serve a compelling governmental interest by the least restrictive means. McCullen v. Coakley, 134 S. Ct. 2518, 2530 (2014).

By contrast, restrictions on speech in traditional public fora that target only the time, place, or manner of expression "[have] the virtue of not singling out any idea or topic for favored or un-favored treatment." Cutting, 802 F.3d at 84. Thus, such content-neutral restrictions ordinarily need only to be narrowly tailored to serve a significant governmental interest and

_____

free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest"). As we will explain, March fails to show that the Noise Provision is facially unconstitutional even if we analyze it as a restriction on speech rather than on conduct. We thus treat the measure, as the District Court did, as one that targets speech. See Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 772-73 (1994) (treating a noise restriction as a regulation of speech, not conduct); Grayned v. City of Rockford, 408 U.S. 104 (1972) (same); Kovacs v. Cooper, 336 U.S. 77 (1949) (same). We do not foreclose the conclusion that the statute regulates conduct rather than speech. We simply see no need to address the issue in light of our conclusion that the Noise Provision is constitutional even if it restricts speech.

- 14 -

to leave open ample alternative channels for communication of the information in order to be upheld on their face. Id. (citing Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).

In general, a "[g]overnment regulation of speech" is content based, rather than content neutral, if it "applies to particular speech because of the topic discussed or the idea or message expressed." Reed v. Town of Gilbert, 135 S. Ct. 2218, 2227 (2015). There are two distinct ways in which a regulation may be deemed to be content based.

First, a regulation may be deemed content based because the "regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." Id. (citation omitted). Second, there is a "separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" Id. (alteration in original) (quoting Ward, 491 U.S. at 791).

We start by considering whether the Noise Provision is content based on its face. Because we conclude that it is not, we then consider whether it is "justified without reference" to content or was "adopted by the government 'because of disagreement with the message [the speech] conveys.'" Id. (alteration in

- 15 -

original) (quoting Ward, 491 U.S. at 791).  In the end, we conclude that the Noise Provision is, in light of its facial neutrality and the content-neutral reasons for its enactment, properly treated as a content-neutral time, place, or manner restriction.

**A.**

In considering whether the Noise Provision is content based on its face, we must be mindful that the First Amendment reflects our commitment to the protection of public discourse and dissent, even where such speech inspires outrage or offense.  For that reason, restrictions on speech in public places are suspect when they curb debate by restricting expression about certain topics or by limiting the discussion of certain ideas. Nevertheless, it is well established that, even in public places, the government may enforce reasonable restrictions on the time, place, or manner of speech in order to protect persons from unduly burdensome noise.  "If overamplified loudspeakers assault the citizenry," after all, the "government may turn them down." Grayned v. City of Rockford, 408 U.S. 104, 116 (1972).  And that is especially the case when loud noise would disrupt sensitive functions in nearby buildings, such as schools or hospitals.  See Gregory v. City of Chicago, 394 U.S. 111, 118 (1969) (Black, J., concurring) ("[N]o mandate in our Constitution leaves States . . . powerless to pass laws to protect the public from the kind of boisterous and threatening conduct that disturbs the

- 16 -

tranquility of . . . buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools, and hospitals.").

Against this backdrop, March appears to accept that a statute that restricts noise made outside a building that actually "jeopardize[s] the health of persons receiving health services within the building; or . . . interfere[s] with the safe and effective delivery of those services within the building" would be, on its face, content neutral. And, in light of the Supreme Court's decision in Grayned, 408 U.S. 104, we do not see how he could contend otherwise.

Grayned concerned a town ordinance that prohibited noise made outside of schools that "disturbs or tends to disturb the peace or good order" of the school. Id. at 107-08 (quoting Rockford, Ill. Code of Ordinances, ch. 28, § 19.2(a)). The Court concluded -- presumably because of the limitless range of sounds that could be used to make noise that would disrupt teaching and learning in a school -- that the ordinance was not targeting the disruptive noisemaking "because of its message." Id. at 115. Rather, the Court explained, the restriction -- in targeting noise "which disrupts or is about to disrupt normal school activities," id. at 119 -- "gives no license to punish anyone because of what he is saying," id. at 120 (emphasis added). On that basis, the

- 17 -

Court treated the measure as a content-neutral time, place, or manner restriction.[5]

Nonetheless, March contends that the Noise Provision is different in an important respect from the measure considered in Grayned. He points out that this measure, unlike the one considered in Grayned, does not single out for restriction loud (and thus disruptive) noise. Rather, the Noise Provision targets only the subset of loud noise made with the intent to "jeopardize the health of persons receiving health services within the building; or . . . interfere with the safe and effective delivery of those services within the building." Me. Rev. Stat. Ann. tit. 5, § 4684-B(2)(D).

In March's view, this disruptive-intent requirement, in narrowing the measure's reach, makes the measure content based on its face by necessarily regulating noisemaking based on the content

_____

[5] We note that in Grayned the appellant also brought a challenge to the ordinance on the ground that the phrase "tends to disturb" was unconstitutionally vague. The Court rejected that contention on the ground that, in light of state court precedent, the phrase was fairly construed "to prohibit only actual or imminent interference with the 'peace or good order' of the school." Id. at 111-12. March makes no similar vagueness challenge -- under either the First Amendment or any other constitutional provision -- to the phrases "[t]o jeopardize the health of persons receiving health services within the building" and "[t]o interfere with the safe and effective delivery of those services within the building," Me. Rev. Stat. Ann. tit. 5, § 4684-B(2), or to any other aspect of the Noise Provision.

of the message conveyed, rather than on the manner of its expression. In particular, March contends that the disruptive-intent requirement necessarily ensures that those who make noise while protesting abortion rights will be treated less favorably than other noisemakers because, unlike in the case of other speakers, the content of their message necessarily will establish their disruptive intent.[6]

We do not agree. On its face, the Noise Provision says not a word about the relevance -- if any -- of the content of the noise that a person makes to the determination of whether that person has the requisite disruptive intent. And, given the limitless array of noises that may be made in a disruptive manner, there is no reason to conclude that disruptive intent is necessarily a proxy for a certain category of content. One's manner of making noise can itself be highly probative of one's disruptive intent quite independent of what one actually says. In consequence, the restriction, at least on its face, would appear to apply, just like the ordinance in Grayned, to noise on any topic or concerning any idea.

---

[6] March makes no argument that the Noise Provision's requirement that law enforcement authorities order the cessation of noise in and of itself raises any constitutional concerns that would require the measure's facial invalidation. Nor did the District Court so hold. We thus focus, like March in his briefing and the District Court in its ruling, on whether the measure is facially invalid in light of its disruptive-intent requirement.

- 19 -

For example, the measure, by its terms, restricts the volume that hospital staff may use in calling for higher wages during a labor strike outside a hospital (provided that the staff make the noise in order to jeopardize the health of those receiving health services inside or to interfere with the safe and effective provision of health services to those inside) just as surely as the measure regulates the volume of speech that opponents of abortion rights may use in advocating for their views outside of a Planned Parenthood facility (provided that they, too, seek to jeopardize the health of those receiving health services inside or to interfere with the safe and effective delivery of services to them). Likewise, the measure, by its terms, may restrict the volume that others may use in expressing opposition to or support for a seemingly endless array of issues that relate to buildings in which health services are provided, from protests favoring or disfavoring vaccination to demonstrations concerning the effects on the rental market of a given health facility's presence (again, provided that such supporters or opponents are found to have had the specified disruptive intent).

Moreover, the measure applies even to loud noise that, in and of itself, conveys no message at all, as it applies to wailing sirens, beating drums, and blaring horns -- provided that, following a cessation order, they may be heard inside and are made with the specified disruptive intent -- no less than to inspiring

chants and political speeches. And, at least according to the face of the measure, loud sounds made with the intent to "jeopardize the health of persons receiving health services within the building; or . . . interfere with the safe and effective delivery of those services within the building," Me. Rev. Stat. Ann. tit. 5, § 4684-B(2)(D), are restricted no less than loud words.

Consistent with this content-neutral focus, the Noise Provision on its face also permits loud noise -- no matter the topic discussed or idea expressed -- if the noise is made without the specified disruptive intent. In consequence, by its terms, the Noise Provision permits loud messages to be communicated concerning any topic or idea, including opposition to abortion, so long as those messages are not made with the specified disruptive intent.

Simply put, under the Noise Provision, all noisemakers may be found to have the requisite intent or to lack it based on what the evidence shows about whether they intend for their noise to be disruptive. And, whether an individual has the requisite intent to interfere with or jeopardize the delivery of healthcare services is a fact-specific inquiry that may depend on a variety of factors, including, crucially, whether the individual has ignored an initial order "by a law enforcement officer to cease such noise." Me. Rev. Stat. Ann. tit 5, § 4684-B(2)(D). Thus, at

- 21 -

least on its face, the measure does not say anything that makes the outcome of that evidentiary inquiry turn on the "communicative content" of the noise.  Reed, 135 S. Ct. at 2227.

For these reasons, the Noise Provision is no more content based, as a facial matter, than is the restriction on disruptive noise found to be content neutral in Grayned.  This measure, like that one, does not on its face purport to restrict noise "because of its message."  Grayned, 408 U.S. at 115.  Rather, like that ordinance, the Noise Provision -- in targeting a subset of loud noise -- does not on its face give "license to punish anyone because of what he is saying."  Id. at 120 (emphasis added).[7]

---

[7] Of course, the measure does appear to target noise only near certain buildings -- namely those in which health services are provided -- just as the ordinance in Grayned applied only to noise made outside schools.  And, those buildings -- like the schools in Grayned -- may well attract certain kinds of speakers, including ones who wish to advocate certain views, like March himself.  But, that fact does not make the measure facially content based.  "[A] facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." McCullen, 134 S. Ct. at 2531 (noting also that "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others" (alteration in original) (quoting Ward, 491 U.S. at 791) (modification in original)); see also Madsen, 512 U.S. at 763 (finding an injunction prohibiting anti-abortion protestors from engaging in certain types of disruptive activity was content neutral and noting that "the fact that [a speech restriction] cover[s] people with a particular viewpoint does not itself render the [restriction] content or viewpoint based").

- 22 -

In response, March presses a number of arguments as to why the measure, due to its disruptive-intent requirement, is content based on its face.  But, we are not persuaded.

March first contends -- as the District Court ruled -- that the measure is content based on its face because, in targeting noise based on the noisemaker's purpose in making it, the measure expressly and necessarily regulates speech based on its "function or purpose."  See March, 2016 WL 2993168 at *10 (citing Reed, 135 S. Ct. at 2227).  Here, March, like the District Court, relies on a single sentence in Reed, in which the Court noted that while "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, . . . others are more subtle, defining regulated speech by its function or purpose."  Reed, 135 S. Ct. at 2227 (emphasis added).

Considered in context, however, this passage has little bearing on our case.  Reed concerned a town sign ordinance that regulated the size and location of signs but exempted twenty-three categories of signs from its reach, including three categories of signs that were the focus of the Court's inquiry into whether the ordinance was, on its face, content based.  Id.  The ordinance defined those three categories -- "[i]deological," "[p]olitical," and "[d]irectional" signs -- in terms of the purpose of the message

that a sign conveyed.[8]  Id.  Reed thus ruled that the town's sign measure was content based on its face, because, as the Court put it, the measure's restrictions that apply "to any given sign . . . depend entirely on the communicative content of the sign."[9]  Id. at 2227 (emphasis added).

At least on its face, however, the Noise Provision does not "depend entirely" for its application on the "communicative content" of noise.  Id.  To borrow the terms used by the ordinance at issue in Reed, the Noise Provision's application does not depend entirely (if, in any case, it depends at all) on whether a review of the noise would reveal its communicative content to convey an ideological ("Abortion is murder"), political ("Vote for the pro-choice candidate"), directional ("Go to our rally down the street"), or, for that matter, entirely unintelligible message.

---

[8] Specifically, the sign ordinance defined "[i]deological" signs as signs "communicating a message or ideas for noncommercial purposes"; "[p]olitical" signs as signs "designed to influence the outcome of an election called by a public body"; and "[t]emporary [d]irectional [s]igns" as signs "intended to direct pedestrians, motorists, and other passersby to a 'qualifying event.'"  Reed, 135 S. Ct. at 2224-25 (emphases added) (quoting Gilbert, Ariz., Land Development Code, ch. 1, § 4.402 (2005)).

[9] As the Court explained by way of example, "[i]f a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election."  Reed, 135 S. Ct. at 2227.  And, indeed, "both signs will be treated differently from a sign expressing an ideological view rooted in Locke's theory of government."  Id.

All of these messages are restricted if -- but only if -- they are conveyed with the intent to disrupt health services being provided in the building in which the noise can be heard, after the noisemaker has "been ordered by a law enforcement officer to cease such noise." Me. Rev. Stat. Ann. tit. 5, § 4684-B(2). Conversely, none of these messages are restricted if they are not made with that disruptive intent. And that is true of any other message that one can conjure.

Thus, while the restriction is "entirely depend[ent]" on the noisemaker's disruptive "purpose" in making noise, the restriction is not entirely dependent -- as was the ordinance at issue in Reed -- on the noise's "communicative content." Id. In fact, it is not clear that the Noise Provision's application is, in any case, dependent on the communicative content of the noise at all. For, as we have explained, one can loudly communicate any content -- on any topic or concerning any idea or message, including even, as Maine recognizes, messages favoring abortion rights -- or even generate noise that does not carry any message whatsoever, with a disruptive intent. And, so long as one does so, the Noise Provision, by its terms, regulates that noise.

Nor are we aware of authority to support the conclusion below that a restriction on disruptive noise, like the one deemed content neutral in Grayned, necessarily becomes content based if it targets only those noisemakers who actually intend for their

- 25 -

noise to be disruptive. Indeed, we would be surprised to find authority to that effect. It is hard to discern the First Amendment interest furthered by a rule that would deem such an otherwise content-neutral restriction to be especially constitutionally suspect simply because it excuses those who violate it only inadvertently.[10]

March also contends, as the District Court concluded, that the Noise Provision is content based on its face for the distinct reason that the Noise Provision "require[s] enforcement authorities to examine the content of the message that is

---

[10] In addition to Reed, March cites to two other cases to support his contention that a speech restriction is content based if it turns on the intent of the speaker. Neither case helps March, however, as both involved provisions that, like the provision in Reed, refer to the "purpose" of speech only as a means of distinguishing among types of content that such speech communicates. See Cahaly v. Larosa, 796 F.3d 399, 402, 405 (2015) (holding that a statute prohibiting "robocalls that are for the purpose of making an unsolicited consumer telephone call or are of a political nature" was content based because it "applie[d] to calls with a consumer or political message but [did] not reach calls made for any other purpose" (quotation marks omitted)); Nat'l Fed'n of Indep. Bus. v. Perez, Civil Action No. 5:16-cv-00066-C, 2016 WL 3766121, at *32 (N.D. Tex. June 27, 2016) (holding that a Department of Labor rule was content based because it turned on whether the speaker "undertakes activities with an object to persuade employees" on issues concerning collective bargaining). Nor are the panhandling cases that March cites to the contrary, as they, too, turn on the content of the regulated speech. See Homeless Helping Homeless, Inc. v. City of Tampa, No. 8:15-cv-1219-T-23AAS2016, 2016 WL 4162882 (M.D. Fla. Aug. 5. 2016); Thayer v. City of Worcester, 144 F. Supp. 3d 218 (D. Mass. 2015); Browne v. City of Grand Junction, 136 F. Supp. 3d 1276 (D. Colo. 2015); City of Lakewood v. Willis, 375 P.3d 1056 (Wash. 2016).

conveyed." March, 2016 WL 2993168 at *10 (emphasis added) (quoting McCullen, 134 S. Ct. at 2531). McCullen did state that the abortion clinic buffer-zone provision there at issue would have been content based "if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." 134 S. Ct. at 2531 (citing Fed. Trade Comm'n v. League of Women Voters of Cal., 468 U.S. 364, 383 (1984)). And, in the case on which McCullen relied for that proposition, League of Women Voters, the Supreme Court did find that a regulation that prohibited certain "noncommercial educational broadcasting station[s]" from "engag[ing] in editorializing," League of Women Voters, 468 U.S. at 366, except on "controversial issues of public importance," id. at 381, was content based on its face. The Court explained that the regulation was facially content based because it defined prohibited speech "solely on the basis of the content of the suppressed speech," such that "enforcement authorities must necessarily examine the content of the message that is conveyed to determine whether the views expressed concern 'controversial issues of public importance.'" Id. at 383.

As we have explained, however, the Noise Provision -- unlike the measure at issue in League of Women Voters -- is not, on its face, dependent for its application on a determination by enforcement authorities regarding the content of the noise made.

- 27 -

Rather, its application depends on whether the noisemaker intended to be disruptive in making the noise, whatever its content. Thus, nothing on the face of the Noise Provision indicates that enforcement authorities must examine the content of the speaker's communication in order to find a violation.

As Maine explains, "it is the continuation of [making noise] after a warning notifying the person that he or she is interfering with the safe and effective delivery of health care that is most probative of [the requisite disruptive] intent," rather than the content of anything that a noisemaker may communicate. And, reinforcing this conclusion, the Attorney General represented at oral argument that the state interprets the Noise Provision to apply to a speaker who intentionally makes noise that can be heard inside a medical building with a reckless disregard for the disruptive effect that such loud noise may have on the provision or receipt of health services being offered inside that building.[11]

---

[11] In taking account of the Attorney General's construction, see Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."); see also Ward, 491 U.S. at 795-96 (in considering a First Amendment facial challenge, "[a]dministrative interpretation and implementation of a regulation are, of course, highly relevant to [the] analysis"), we are aware that March contends that the Attorney General's construction "would conflate" the Noise Provision's two separate intent requirements "into one -- merely

It is possible that, on the facts of a given case, the communicative content of noise may supply helpful evidence (to one side or the other) regarding the noisemaker's intent.  But, that fact does not show that the measure is content based on its face.  Cf. Hill v. Colorado, 530 U.S. 703, 721 (2000) (noting that "[i]t is common in the law to examine the content of a communication to determine the speaker's purpose" in finding a measure that restricted the purposes for which persons could be approached near medical facilities to be content neutral).  In Grayned, for example, the Court held that the disruptive noise restriction at issue was content neutral, even though that measure targeted noisemakers only if they acted "willfully" in making noise that is "actually incompatible with normal school activity" where there is "a demonstrated causality" between the noise made and the disruption that occurs.  408 U.S. at 113.  Thus, that measure, like this one, appeared to contemplate that, in a given instance, the message shouted -- for example, "Shut Down Schools Now!" as opposed to "Keep Them Open!" -- might at least be probative, though

_____

continuing to make noise after being warned by law enforcement[,]" and, by doing so, would thereby "leave the second intent requirement of intent to interfere with a medical procedure without any operative effect."  But, that is plainly wrong.  The second intent requirement, unlike the first, would, for example, protect an unwitting speaker who, after having been ordered to stop making noise loud enough to be heard in a nearby medical facility, continues intentionally to make such noise but does so unaware that medical services are being provided nearby at that time.

not necessarily determinative, of whether the intent standard had been met. Yet, the Court did not find that measure to be content based. And, as we have explained, Reed held that the sign ordinance at issue in that case was content based only because the ordinance's applicability "depend[ed] entirely on the communicative content" of a given sign. 135 S. Ct. at 2227 (emphasis added). Thus, Reed does not suggest that a provision is content based merely because the communicative content of noise could conceivably be relevant in ascertaining the noisemaker's disruptive intent.

Finally, March argues, citing R.A.V. v. City of St. Paul, 505 U.S. 377 (1992), that the Noise Provision is on its face an "unconstitutional content based restriction because, in 'practical operation,'" it targets "proponents of specific topics." Id. at 391-92 (emphasis added). R.A.V. did not, however, find a measure to be content based on its face in consequence of its "practical operation." Id. R.A.V. instead found only that a measure that was facially content based was in "practical operation" viewpoint based. Id.

Even assuming that such a practical inquiry can make a facially content-neutral measure facially content based -- a surprising proposition for which March cites no authority -- we do not see how this is a case that would yield such an outcome. As we have explained, an inquiry into whether a noisemaker has a

- 30 -

disruptive intent -- given the limitless means that one may use to make noise in a disruptive manner -- is not inherently an inquiry into what message a speaker is trying to convey.  And, on its face, it is the disruptive intent, and not the message, if any, conveyed with that intent, that determines whether the Noise Provision applies.

Nor is this conclusion undermined by March's vivid hypothetical, in which he posits a person who stands in front of an abortion clinic and shouts, "Honey, you forgot your lunch!" directly inside the facility.  March contends that such a speaker, precisely because of his well-meaning message, obviously will not be found to have the disruptive intent that the statute requires.  By contrast, March contends, the anti-abortion protester enjoys no such protection, as the content of that protester's speech will necessarily be found to evince the protester's disruptive intent.

But, while we agree that the provision would be subject to a serious as-applied challenge if its disruptive-intent requirement were enforced in an entirely content-dependent way, the measure does not require, as a practical matter, such uneven, content-based enforcement.  As Maine points out, the most probative evidence of disruptive intent is a person's decision to intentionally keep making loud noise after having been warned of its disruptive effect.  March's seemingly thoughtful shouter is thus not immune, even practically speaking, from the Noise

- 31 -

Provision's reach in consequence of the seemingly kind content of his message -- any more than is any noisemaker in consequence of theirs.  And, by the same token, the anti-abortion protester is not necessarily subject to the restriction because of the anti-abortion message that he may espouse.  The protester is, like the helpful shouter, subject to the Noise Provision's restriction on noisemaking only if he expresses that message in a certain manner -- that is, with the specified disruptive intent and "after having been ordered by a law enforcement officer to cease," Me. Rev. Stat. Ann. tit. 5, § 4684-B(2) -- and not because of "what he is saying,"  Grayned, 408 U.S. at 120.

**B.**

There remains the question whether the Noise Provision, despite its facial neutrality, is "justified without reference to content" or was instead adopted because of the state's disagreement with the content of any message expressed.  Ward, 491 U.S. at 791 (quoting Clark v. Cmty. for Creative Nonviolence, 468 U.S. 288, 293 (1984)).  According to Maine, the Noise Provision is content neutral in purpose, just as it is on its face, even accounting for the disruptive-intent requirement, because it (1) aims to protect patients from "[t]he type of noise most likely to cause harm" to their "right to receive safe and effective medical care," and (2) serves to identify the subset of noise that is "most likely" to cause that harm on the basis of characteristics that are not

- 32 -

dependent on the content of any message that the restricted noise may communicate.

To understand why we agree with Maine, it helps to review the findings that the District Court made regarding the differing deleterious effects of certain types of noise -- independent of the communicative content of that noise -- on the provision and receipt of health services. The District Court made these findings in connection with evidence regarding noise heard within the Planned Parenthood Health Center on Congress Street in Portland, where March has been protesting.

Specifically, the District Court found, from the evidence in the record, that "[l]oud and sustained yelling that is audible within the Health Center interferes with the Health Center's staff's ability to provide care to their patients." March, 2016 WL 2993168 at *3. And, the District Court explained, such noise is problematic because, as common sense would suggest, "[t]o effectively deliver health services, staff need a calm and quiet environment for their interactions with patients." Id. The District Court further found, again based on evidence in the record and in accordance with common sense, that, wholly apart from the content of any message communicated by loud noise, "loud noise distracts patients and renders them unable to concentrate on their discussions with staff," which "in turn causes staff to spend more

- 33 -

time repeating instructions to patients, which causes additional delays for the entire facility." Id.

As the District Court pointed out, "[l]oud noise from outside the building has a physiological effect on patients, causing additional stress and elevated blood pressure, pulse, and respiratory rates." Id. at *4 (quotation omitted). As a result, "such noise often causes patients to . . . move to other areas of the Health Center where the noise is less audible," which causes "patients [to be] separated from people who are there to support them." Id.

But, and this is the crucial point, the District Court also found, based on evidence in the record, that a certain type of loud noise -- again, for reasons wholly independent of the content of any message that such noise may convey -- is especially likely to jeopardize patients' health or to interfere with the delivery and receipt of health services. The District Court explained that, while evidence in the record showed that "[t]ransitory noise produced by parades, sirens, and car horns" has "the potential to disrupt medical care," such loud sounds are "normally brief in duration and any disruption dissipates quickly." Id.

By contrast, according to the District Court, the record showed that "[l]oud and sustained yelling that is audible within the [facility] interferes with the . . . staff's ability to provide

- 34 -

care to their patients." Id. at *3. And, the District Court further found, "[u]nabated constant noise that is specifically directed at patients is uniquely disruptive to the . . . ability to provide medical care." Id. at *4 (emphasis added).

These findings support Maine's contention that Maine is regulating a type of loud noise that is likely to be uniquely disruptive for reasons that have to do with the manner in which the noise is made rather than with the content of any message that such noise may convey. After all, given the requirement that the prohibited noise must have been intentionally made after law enforcement authorities order its cessation, the Noise Provision does target only loud noise that is made in a "sustained" manner. Id. at *3. And, given the requirement that the noise be made with the specified disruptive intent, the Noise Provision regulates such sustained loud noisemaking only when it is likely to be "specifically directed" at the building in which health services are provided. Id. at *4. We thus have no reason to doubt that the Noise Provision proscribes a subset of speech that is likely to constitute the kind of "[u]nabated constant noise that is specifically directed at patients" that the record shows has a "unique" capacity to be disruptive in consequence of the

manner -- rather than the content -- of the expression.  See id.

(emphasis added).[12]

A simple example -- having nothing to do with the charged

context that this suit foregrounds -- helps to illustrate why we

conclude that, on this record, Maine's decision to target only

this subset of loud noise is justified "without reference to the

content" of the noise restricted or because of any disagreement

with any message that may be expressed.  Reed, 135 S. Ct. at 2227.

As any parent knows, a child who makes loud noise in order to

_____

[12] This measure is thus unlike the one addressed in Boos v. Barry, 485 U.S. 312 (1988).  There, the Court considered a District of Columbia regulation that prohibited "the display of any sign within 500 feet of a foreign embassy if that sign tends to bring that foreign government into 'public odium' or 'public disrepute.'"  Id. at 315.  The Court explained that such a regulation may be content neutral if justified by a "secondary effect," such as "congestion," "visual clutter," "interference with ingress or egress," or "the need to protect the security of embassies."  Id. at 321.  The Court also concluded, however, that such a regulation could not be content neutral if "justified only on the content of speech and the direct impact that speech has on listeners" -- that is, "[t]he emotive impact of speech on its audience."  Id. (emphasis in original).  But, unlike in Boos, the Noise Provision does not require a judgment as to whether noise tends "to bring [the listener] into 'public odium' or 'public disrepute.'"  Id.  It is enough under the Noise Provision that the noise -- whatever its communicative content -- is made loud enough for the listener to hear and with the intent to jeopardize the health of people receiving health services or to interfere with the medical service that patients have sought to obtain.  Cf. Texas v. Johnson, 491 U.S. 397, 407 n.4 (1989) (stating that regulations justified by the desire merely "to prevent an audience from being offended" may be distinguishable from those justified by the desire "to prevent a violent audience reaction," even where that reaction "would be the result of the message conveyed" by the regulated speech).

disrupt her parent can do so as readily with endearing words as annoying ones, or, for that matter, with "words" that are quite impossible to discern. A parent thus might understandably seek to shush that intentionally disruptive child even as the parent tunes out the nearby sibling whose equally loud sounds are easier to ignore precisely because they are, thankfully, not intended to bother anyone at all. And, in quieting the one child and not the other, the parent is not favoring or disfavoring any message. The parent is merely acting on what we might describe as a perfectly understandable content-neutral interest in putting an end to an unwanted disruption that, because intended, may be especially hard to put out of one's mind. See Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 530, 546-47 (1980) (Stevens, J., concurring) (explaining that "a communication may be offensive in two different ways," in that some speech, "even though elegantly phrased in dulcet tones, [is] offensive simply because the listener disagrees with the speaker's message," while other speech is offensive "[i]ndependently of the message the speaker intends to convey," due to "the form of [the] communication . . . perhaps because it is too loud or too ugly in a particular setting").

The Supreme Court has deployed a similar logic in finding speech restrictions not unlike Maine's to be content neutral. For example, in finding content neutral the restriction on "knowingly approaching" another person for certain purposes outside certain

- 37 -

medical facilities, the Court in Hill explained that "[i]t may not be the content of the speech, as much as the deliberate 'verbal or visual assault,' that justifies proscription." Hill, 530 U.S. at 716 (alteration in original) (emphasis added) (quoting Erzoznik v. City of Jacksonville, 422 U.S. 205, 210-211, n.6 (1975)). Similarly, in Frisby v. Schultz, 487 U.S. 474 (1988), the Court concluded that the fact that an ordinance prohibiting picketing in front of a single home -- conduct that obviously conveyed to the homeowner that he was the object of the expression -- did not render the ordinance content based. Id. at 488. The Court emphasized that targeted picketing "inherently and offensively intrudes on residential privacy," resulting in a "devastating effect . . . on the quiet enjoyment of the home," regardless of whether "such picketers have a broader communicative purpose," id., and that "the 'evil'" of the restricted speech was thus not what was said but only "the medium of expression itself," id. at 486 (quoting Members of City Council of City of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 810 (1984)).

## C.

For these reasons, we reject the contention that, on its face or in its object, the Noise Provision is content based. Rather, we conclude that, the measure is a content-neutral restriction on the time, place, or manner of expression that, accordingly, need be justified only under the standard of review to which such content-neutral speech restrictions are subject in order to survive this facial constitutional challenge.

## III.

Because the District Court concluded that the Noise Provision is content based, the District Court did not address whether the measure survives the less-demanding standard of scrutiny -- often referred to as intermediate (as opposed to strict) scrutiny -- applicable to content-neutral restrictions. Neither party, however, asks us to remand the case for the District Court to apply that form of review in the first instance or to undertake further factual development. Rather, both parties have briefed the issue fully. We thus turn to the question whether the Noise Provision can survive March's facial challenge under the intermediate level of scrutiny that usually applies to content-neutral speech restrictions. See Cutting, 802 F.3d at 86 (declining to remand for the District Court to apply intermediate scrutiny in the first instance). That inquiry requires us to determine if the restriction is narrowly tailored to serve a

- 39 -

significant governmental interest and leaves open ample alternative channels for communication of the information.  See Ward, 491 U.S. at 791.

**A.**

We begin by considering the strength of the interest that Maine seeks to advance through the Noise Provision.  Maine asserts a number of interests, including that the Noise Provision is intended to ensure that "all of [Maine's] citizens are able to receive safe and effective health care."  And, as the District Court recognized, that interest is quite clearly a significant one.  March, 2012 WL 2993168 at *12.[13]

For example, in finding that a restriction on noise outside an abortion clinic served a significant governmental interest, the Supreme Court in Madsen v. Women's Health Ctr., Inc., 512 U.S. 753 (1994), explained that hospitals are places "where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and

---

[13] Maine emphasizes, in addition, that "patients arriving at a facility for abortion services are already in a highly emotional and anxious state," particularly if they have "recently experienced emotional or physical trauma."  Maine further emphasizes that the difficulties communicating with such patients are often exacerbated by such patients' relative lack of sophistication "when it comes to obtaining health care," and by language difficulties.  From the record before us, those concerns would appear to apply equally to patients seeking to receive other types of health services in the state, and March does not contend otherwise.

comforting patients are principal facets of the day's activity, and where the patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere." Id. at 772 (quoting NLRB v. Baptist Hosp., Inc., 442 U.S. 773, 783-84 n.1 (1979)). And, the Court added, "[t]he First Amendment does not demand that patients in a medical facility undertake Herculean efforts to escape the cacophony of political protests." Id. at 772-73. Moreover, as the Court has elsewhere explained, the "privacy interest in avoiding unwanted communication" is strongest when listeners are "powerless to avoid it" -- for example, because they are being targeted "in the confines of [their] own home[s]" or, as here, when they are "patients at a medical facility." Hill, 530 U.S. at 716 (citations omitted).

March contends that the Noise Provision "cannot be regarded as protecting" a significant governmental interest because "it leaves appreciable damage to [the] supposedly vital interest unprohibited."[14] Reed, 135 S. Ct. at 2232 (citation omitted). Specifically, March argues that the state's interest is implicated equally by noise made loudly and in a sustained fashion

_____

[14] March chiefly presses his underinclusiveness argument in connection with his argument as to why the Noise Provision, if content based, would fail strict scrutiny. March makes at most a glancing argument as to why the Noise Provision, if found to be content neutral, would fail intermediate scrutiny due to its alleged underinclusiveness. We nonetheless reject the argument even assuming it is preserved.

but without the disruptive intent specified in the Noise Provision. March therefore contends that the measure is fatally underinclusive. March notes in this regard that a restriction on the decibel level or duration of noise, or perhaps both combined, would better address the disruption Maine claims to be addressing. And yet, March contends, Maine has opted for a less protective restriction that -- through its disruptive-intent requirement -- invites an examination of the content of the message communicated by the noise.

We agree with March that, if a speech restriction tolerates too much of the very harm that the state claims it is trying to address, there may be reason to doubt the seriousness of that harm. See Reed, 135 S. Ct. at 2232. In addition, when a restriction on speech is underinclusive, there may be reason to doubt "whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." See Williams-Yulee v. Fla. Bar, 135 S. Ct. 1656, 1668 (2015) (quoting Brown v. Entm't Merchants Ass'n, 564 U.S. 786, 802 (2011)); see also Matal v. Tam, 137 S. Ct. 1744, 1764 (2017) (explaining that the very idea that the government "has an interest in preventing speech expressing ideas that offend . . . strikes at the heart of the First Amendment"); Snyder v. Phelps, 562 U.S. 443, 458 (2011) (explaining that speech may not be restricted "simply because it is upsetting").

- 42 -

In this case, however, there is no underinclusivity problem of the sort that March alleges. As we have explained, March does not challenge the District Court's finding that "[u]nabated constant noise that is specifically directed at patients" is "uniquely disruptive." March, 2016 WL 2993168 at *4 (emphasis added). And, as we have also explained, noise that is (1) intentionally made loud enough to be heard inside a building, (2) in disregard of an earlier order by law enforcement to cease making it, and (3) with an intent to jeopardize the health of those receiving medical services in that building or to interfere with the effective delivery in that building of those services, would seem to be just that kind of noise. Thus, because Maine has targeted a subset of loud noise that is likely to cause the "unique" harm that Maine has a significant interest in singling out, we cannot say that Maine has chosen to leave "appreciable damage to [the] supposedly vital interest unprohibited." Reed, 135 S. Ct. at 2232 (citation omitted).

For this reason, this case is not like Cutting, 802 F.3d 79, on which March mistakenly relies. There, we held that, because a city had identified only a small subset of expressive activity that actually caused harm, the city's sweeping speech restriction could not be justified. See id. at 89-90. Here, by contrast, the Noise Provision targets the subset of noise that Maine has identified as being especially problematic.

- 43 -

**B.**

March next contends that, even if the Noise Provision does serve Maine's claimed interest in protecting the safe and effective provision and receipt of health services, the Noise Provision is facially unconstitutional because it is not narrowly tailored to serve that interest. Here, too, we disagree.

The narrow tailoring requirement does not demand perfect tailoring. The requirement is "satisfied as long as the particular regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Knights of Columbus, Council No. 94 v. Town of Lexington, 272 F.3d 25, 33 (1st Cir. 2001) (quotation omitted). Nevertheless, the narrow tailoring restriction does require "that a challenged speech restriction not burden 'substantially' more speech than is necessary to further the government's interest." Cutting, 802 F.3d at 86 (quoting McGuire v. Reilly, 260 F.3d 36, 48 (1st Cir. 2001)).

Maine, relying on Frisby's conclusion that the targeted picketing ordinance there was narrowly tailored because it applied only to speakers who intended to "intrude upon the targeted resident . . . in an especially offensive way," 487 U.S. at 486, contends that the Noise Provision "prohibits only the making of noises that can be heard within a building and [are] made with the intent to interfere with the safe and effective delivery of health

- 44 -

services."  As a result, Maine argues that the Noise Provision does not restrict substantially more speech than necessary because "[t]here is simply no way that the restriction could be more narrowly tailored."

March argues in response that the Noise Provision is too sweeping because it applies "24-hours a day, seven days a week regardless of the actual hours that 'health services' are being offered or the hours of the building's operation." (quoting Me. Rev. Stat. Ann. tit. 5, § 4684-B(2)(D)).  In fact, however, the Attorney General has interpreted the Noise Provision not to apply when a building providing health services is closed, or when there are no patients inside, and we have no reason not to accept that perfectly sensible representation about how the disruptive-intent requirement operates.  See Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 131 (1992); Ward, 491 U.S. at 795-96; Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 66 (1st Cir. 2011).

March contends, next, that the Noise Provision is not narrowly tailored because it applies to public fora including streets and sidewalks.  But, without more, this fact hardly shows that this provision is not narrowly tailored.  After all, we evaluate whether this restriction is narrowly tailored in part because it applies to speech in traditional public fora.

Finally, March posits that the statute is "extremely broad in manner" because it "has no decibel level requirements or

even shouting requirements, allowing enforcement against . . . lone, unamplified voices." March suggests that by requiring only that noise be loud enough to be heard within a building, the Noise Provision "allows abortion providers to claim violations where none exist."

To be subject to the Noise Provision, however, a "lone, unamplified voice[]" must still be loud enough to be heard within a building and must speak with the requisite disruptive intent. Thus, the requirements laid out on the face of the Noise Provision do not indicate that the measure would apply to speech expressed at a normal, conversational tone -- or even at a louder volume -- absent the speaker's intent to disrupt the provision or receipt of medical services.

March appears to be contending in part that this disruptive-intent requirement does not meaningfully narrow the measure's scope in light of his apparent belief that the messages he wishes to propound will necessarily establish the requisite intent. But, for reasons we have explained, the face of the measure provides no support for this understanding of its application, and we need not consider "[p]articular hypothetical applications of the [challenged] ordinance" which "may present somewhat different questions" than the question whether the ordinance is constitutional on its face. Frisby, 487 U.S. at 488.

March does allege several examples where enforcement of the Noise Provision seems to have been inconsistent with the face of the provision, both in terms of uneven application to different speakers and in terms of the permissible volume of regulated speech. It is not entirely clear whether March means for these points to constitute the basis for a facial challenge rather than an as-applied one, and the record contains conflicting evidence. But, in any event, we have no basis for concluding that inconsistent enforcement of the type that March alleges has occurred outside the Planned Parenthood Health Center in Portland is mandated by the measure. Moreover, March's allegations about how the measure may have been enforced in ways that the terms of the measure do not require at a lone clinic in a single city do not suffice to render the state statute too sweeping on its face. See United States v. Stevens, 559 U.S. 460, 473 (2010) (noting that courts will not find a speech restriction facially overbroad under the First Amendment unless "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep").[15]

---

[15] In addressing whether the Noise Provision satisfies strict scrutiny, March relies on R.A.V., 505 U.S. at 395, to contend that the measure is not the least restrictive means necessary to achieve the state's interest because the measure could have relied on a "content neutral alternative" to the intent requirement, such as limiting the volume or duration of noise, which he contends would have had "the same beneficial effect." March does not raise a

c.

　　We turn, then, to the final aspect of the inquiry: whether the Noise Provision, at least on its face, "leave[s] open ample alternative channels for communication."  Ward, 491 U.S. at 791 (quoting Clark, 468 U.S. at 293).  We conclude that it does.

　　The Supreme Court held that the disruptive noise restriction in Grayned left open ample alternative channels of communication because permitted means of expression, like "picketing and handbilling[,] . . . can effectively publicize grievances" to both those within a building and passersby.  408 U.S. at 119; see also Frisby, 487 U.S. at 484 (explaining that the prohibition on targeted picketing "preserves ample alternative channels of communication" because protesters may still "enter

---

similar argument with regard to whether the Noise Provision satisfies intermediate scrutiny, which does not require that the restriction be the least restrictive possible means to achieve the state's interest.  See Cutting, 802 F.3d at 86.  Thus, it is not clear that March means to make this argument in connection with his contention that the measure fails even the less-demanding scrutiny that applies to content-neutral measures.  But, insofar as this argument is properly before us, we note that, for the reasons we have explained, the disruptive-intent requirement is not content based.  And thus this measure does not on its face privilege a content-based means over a content-neutral one.  Nor, given the state's interest in reducing the unique harm caused by noise that is targeted directly at patients, is Maine lacking a content-neutral reason for concluding that a limit on decibel level or duration would not serve its asserted interest just as well as would this measure.  Rather, such a decibel or durational limit would, instead, restrict more speech than Maine claims to have any comparable need to restrict.  And Maine can hardly be faulted under the First Amendment for regulating in such a tailored fashion.

[residential] neighborhoods, alone or in groups, even marching[,]" "go door-to-door to proselytize their views" or "distribute literature," "distribute literature . . . through the mails," and "contact residents by telephone"). Maine emphasizes that the Noise Provision similarly permits speakers to "congregate in the vicinity of clinics, hand out literature, display signs, attempt to engage in conversation with persons entering or passing by the clinic, and orally express their views loudly enough to be heard in the immediate vicinity."

March responds that, in fact, the measure does not leave open alternative channels of communication because it prohibits him from "rais[ing] his voice to be heard even by those close to him over the volume of the traffic," and thus "effectively eliminates [his] ability to counsel . . . women on a public sidewalk." But the face of the Noise Provision simply does not show that it restricts speech in the manner that March contends. And, as we have explained, March misapprehends the nature of a facial challenge to the extent that his argument relies on allegations about how the statute has been applied (or, perhaps, how it has been misapplied) in certain specific instances. We thus see no basis for accepting the only contention that he makes for concluding that the measure does not permit ample alternative channels of communication.

March therefore has not shown that the measure, on its face, fails this aspect of intermediate scrutiny.  And, in light of our conclusions regarding the preceding aspects of our analysis under this form of review, the Noise Provision survives intermediate scrutiny.

## IV.

The Noise Provision was the product of a careful legislative process.  That process sought to forge a consensus among many competing interests in order to address what all parties to this dispute agree is a serious concern regarding the health and safety of those seeking health services.  The result is a facially content-neutral measure that targets noise for reasons that have nothing to do with the content of any topic discussed, idea propounded, or message conveyed.  Moreover, by its terms, the measure serves that significant state interest without burdening substantially more speech than necessary and while leaving open ample alternative avenues for communication.  Accordingly, March has not shown that he has a likelihood of success on the merits of his facial constitutional challenge to the Noise Provision.  The judgment of the District Court is therefore **reversed**.