# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 4, 2025

Lyle W. Cayce
Clerk

No. 24-60199

_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

JUSTIN GREGORY JUBERT,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:23-CR-109-1

_____

Before STEWART, CLEMENT, and WILLETT, *Circuit Judges*.
CARL E. STEWART, *Circuit Judge*:

The First Amendment protects speech that provokes, disturbs, or even offends. That is, after all, "the theory of our Constitution."[1] But speech that threatens real harm crosses a different line.

Justin Gregory Jubert pleaded guilty to cyberstalking under 18 U.S.C. § 2261A(2)(B), preserving his right to challenge that law under the First Amendment. He argues that the statute goes too far, punishing protected

_____

[1] *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

expression. The government responds that it reaches only conduct meant to harass, intimidate, or instill fear.

We address two questions: (1) whether the statute is facially overbroad, and (2) whether Jubert's own conduct qualifies as a true threat. We conclude that the statute is not overbroad and that his conduct lies beyond constitutional protection. For these reasons, we AFFIRM.

I

Jubert was charged with one count of cyberstalking under 18 U.S.C. § 2261A(2)(B) and one count of transmitting a threatening communication in interstate commerce. The charges stemmed from a monthslong online campaign during which Jubert threatened, harassed, and intimidated the victim—referred to here as M.R.—as well as M.R.'s wife and their two minor daughters.

The history between the two stretched back decades. In 2002, M.R., then a camp director at a summer camp in Bay St. Louis, Mississippi, fired Jubert from his role as a camp counselor. Nearly twenty years later, Jubert resurfaced—this time online. Between late May and August 2023, he used six separate Facebook accounts to post threats, insults, and menacing messages directed at M.R., his wife, and their two minor daughters.

Jubert's conduct escalated over time. Initially, he posted insults about M.R., calling him "trash," "garbage," a "POS," a "beta," and a "certified doucher." He negatively reacted to M.R.'s Facebook posts, M.R.'s wife's posts, and comments about them over 200 times. Each interaction triggered a notification to the victims.

Soon after, the campaign became more threatening. Jubert posted M.R.'s work address and personal photos, as well as photos of M.R.'s children. In one post, Jubert wrote, "Might just need to talk to these 2 LOL,"

under a photo of M.R.'s minor daughters. He commented on M.R.'s professional headshot, saying, "if u [*sic*] see this POS, eeeexcuttttte him on site he is la basura . . ." In another, he warned, "I can't wait to F you up. It's coming soon. Your life will cease too."

By August 2, 2023, Jubert intensified his threats, posting that "none of this will stop until the casket drops." Later that month, he capped his campaign with a chilling post: "Now I have a pic of the family, PERFECT . . . tonight I really was thinking of taking up serial killing as a hobby, hope I keep taking my Bipolar 1 meds . . ." Jubert's campaign to instill fear escalated when he began cyberstalking the facility where M.R.'s daughters played volleyball. Between August 20 and August 23, 2023, he interacted with a Facebook page that posted the locations where M.R.'s daughters would be playing during that period.

Throughout the course of this harassment, Jubert took steps to ensure that M.R. and his family would see his posts. He "shared" family photographs, reacted to their posts, and even commented directly on M.R.'s wife's Facebook page, calling her a derogatory slur. As a result of his activity, the family felt compelled to take substantial security measures: they installed cameras, purchased a security system, equipped their daughters with a panic button, and eventually contacted both local police and the FBI.

Jubert moved to dismiss the charges, arguing that his posts were protected speech under the First Amendment and that § 2261A(2)(B) was unconstitutional both facially and as applied. The district court rejected the facial challenge but deferred the decision on the as-applied challenge, concluding that it raised factual disputes that were better addressed at trial.

Jubert thereafter pleaded guilty to the cyberstalking charge, reserving his right to appeal the denial of his motion to dismiss. The district court

sentenced him to 27 months' imprisonment followed by three years of supervised release. Jubert filed a timely notice of appeal.

## II

We have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291, which confer jurisdiction on the courts of appeals from final decisions of the district courts. Jubert entered a conditional guilty plea under a plea agreement and specifically reserved his right to appeal the denial of his motion to dismiss.

We review the district court's denial of the motion to dismiss the indictment *de novo*; we also review constitutional claims *de novo*. *United States v. Ollison*, 555 F.3d 152, 160 (5th Cir. 2009); *see also United States v. Petras*, 879 F.3d 155, 166 (5th Cir. 2018) ("We review constitutional claims de novo."). We may also affirm a judgment in a criminal case "on any basis supported by the record." *United States v. Holdman*, 75 F.4th 514, 519 (5th Cir. 2023) (citing *United States v. Jackson*, 453 F.3d 302, 308 n.11 (5th Cir. 2006)).

Regarding § 2261A(2)(B), Congress enacted it in 2006 and expanded it in 2013. Under the statute:

> 1. The defendant must use "the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce" at least twice. 18 U.S.C. § 2261A(2); *see also id.* § 2266(2).

> 2. He must have acted "with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person." *Id.* § 2261A(2).

3. Finally, he must "engage in a course of conduct that . . . causes, attempts to cause or . . . would be reasonably expected to cause substantial emotional distress." § 2261A(2)(B).

As amended, the statute brands a defendant a cyber-stalker if he checks all three boxes.

## III

"A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). "When a litigant brings both as-applied and facial challenges, we generally decide the as-applied challenge first because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (citing *Serafine v. Branaman*, 810 F.3d 354, 362 (5th Cir. 2016)). We address an "overbreadth issue only if it is determined that the statute would be valid as applied." *Id.* at 854 (internal quotations omitted). Thus, we proceed with Jubert's as-applied challenge and then turn to his overbreadth challenge.

## A

We consider whether § 2261A(2)(B), as applied to Jubert, violates the First Amendment. Jubert argues that the statute crosses a constitutional line. In his view, it punishes speech, not conduct; ideas, not actions. He faults the district court for treating the statute as a regulation of conduct alone—a framing, he contends, that sidesteps strict scrutiny. Because the statute turns on what he said, not how he said it or to whom, Jubert maintains that it imposes a content-based restriction.

Jubert also denies that his posts fall within the "true threats" exception to the First Amendment. He identifies three features that he claims our precedent requires: a specific target, a defined method, and direct communication. His posts, he argues, met none. They were conditional, vague, and impersonal. He named no time, no place, and no plan. He voiced

no intent to act. On that view, he believes that the indictment must fall. He is wrong.

The government may not restrict speech simply "because of its message, its ideas, its subject matter, or its content." *See Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (internal quotations omitted). But the First Amendment does not protect all expression. Its guarantees yield to "the few historic and traditional categories of expression long familiar to the bar." *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion) (cleaned up). Those categories include true threats, speech integral to criminal conduct, defamation, and obscenity. *Id.* (collecting cases).

"True threats are serious expressions conveying that a speaker means to commit an act of unlawful violence." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (cleaned up); *see also Virginia v. Black*, 538 U.S. 343, 359 (2003); *Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969) (per curiam). "True" delineates the speech at issue from jest or hyperbole. *Id.* (internal citation omitted). The speaker's awareness of the "threatening aspect of the message" and his intent to convey it "is not part of what makes a statement a threat." *Counterman*, 600 U.S. at 74 (citing *Elonis v. United States*, 575 U.S. 723, 733 (2015)). "The existence of a threat depends not on the mental state of the author, but on what the statement conveys to the person on the receiving end." *Id.* (internal quotations omitted). "True threats subject individuals to fear of violence and to the many kinds of disruption that fear engenders." *Id.* (internal quotations omitted).

"Speech is a true threat and therefore unprotected if an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm." *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 616 (5th Cir. 2004) (cleaned up). "The speaker need not actually intend to carry out the threat." *Black*, 538 U.S. at

359–60. "Importantly, whether a speaker intended to communicate a potential threat is a threshold issue, and a finding of no intent to communicate obviates the need to assess whether the speech constitutes a true threat." *Porter*, 393 F.3d at 616–17 (internal quotations omitted).

True threats are unprotected because they have relatively low value and restricting them "protects individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) (cleaned up). "None of those factors turns on whether a speaker names individuals or merely places them where those individuals are likely to be." *United States v. Perez*, 43 F.4th 437, 444 (5th Cir. 2022) (holding that Facebook posts in which the speaker falsely claimed that he had paid a person infected with the COVID-19 virus to lick everything in two specific grocery stores in San Antonio were true threats). Whether the threat describes future events is not dispositive to this court's inquiry. *Id.* at 443 (citing *United States v. Reynolds*, 381 F.3d 404, 406 (5th Cir. 2004) (concluding in a different context that threats may refer to past conduct)).

In this case, Jubert's as-applied challenge fails. We assume without deciding that § 2261A(2)(B), as enforced here, targets Jubert's speech. Even so, his speech contained true threats.

True threats are "serious expressions" of an intent to commit unlawful violence. *Counterman*, 600 U.S. at 74 (cleaned up). The inquiry is twofold: whether a reasonable person would perceive the statement as threatening, and whether the speaker was subjectively aware of its threatening nature. *Id.* at 72–73 (holding that the First Amendment requires defendants in true-threats cases to be aware of the threatening nature of their communications and adopting recklessness as the standard). Jubert's conduct meets both prongs.

The record shows escalation. He began with insults—calling M.R. "garbage." Then came the threats. Jubert called for M.R.'s "execution," warned, "I cant wait to FFFFFF u up, its coming soon, ur life will cease to……" He continued: "None of this will stop until the casket drops." He tracked the daily movements of M.R.'s minor daughters. He closed with a post invoking serial killing. This was not spontaneous venting. It was targeted, sustained, and deliberate. The record shows more than awareness—it shows intent. Jubert ensured that his victims saw the posts. He shared their photos, followed their pages, commented on M.R.'s wife's account. The government did not infer fear. Jubert manufactured it.

The victims' responses confirm this point. M.R. installed cameras. He bought a security system. His children received a panic button. The family changed their routines. M.R. went to local police, then to the FBI. Fear, standing alone, may not be dispositive. But here, it was the predictable result of deliberate conduct. Jubert's suggestion that the family failed to block him misses the mark. He used at least six separate Facebook accounts to bypass those efforts. That is not exculpatory; it is aggravating.

Nor do his cited cases offer his argument refuge. In *Bailey v. Iles*, the defendant's social media post referenced "the infected" and included a hashtag invoking a movie character. 87 F.4th 275, 280–81 (5th Cir. 2023). The court concluded that no one took it seriously. Here, Jubert's statements were not couched in humor or satire. And unlike in *Bailey*, Jubert admitted in his plea agreement that he intended to intimidate or harass. *Watts v. United States* involved a conditional statement made at a political rally. 394 U.S. 705 (1969) This court determined it to be political hyperbole, made offhand in protest of government policy. *Id.* at 706, 708. Jubert's conduct bears no resemblance. His posts were not part of a rally and were not addressed to public officials. They targeted a private individual and his family. Lastly, *United States v. O'Dwyer* involved vague speculation about

becoming homicidal. 443 F. App'x 18 (5th Cir. 2011) (per curiam). But Jubert's threats were not vague. They were specific, posting photos of the victim, naming him, referencing his children, and seemingly tracking their physical location.

Taken together, the evidence points in one direction. Jubert's statements were true threats. He knew what he said. His targets understood what he meant. The First Amendment does not protect that. Because Jubert's posts were true threats, we hold that § 2261A(2)(B), as applied here, is constitutional, and it does not violate Jubert's right to freedom of speech.

B

Considering that Jubert's as-applied challenge fails, we turn to his facial claim. *See Buchanan*, 919 F.3d at 852. Jubert argues that § 2261A(2)(B) sweeps too broadly and criminalizes protected speech. He challenges the district court's conclusion that the statute regulates conduct alone. In his view, the statute reaches speech—emails, texts, and social media posts—and thus implicates the First Amendment. He cites *United States v. Yung*, where the Third Circuit acknowledged that § 2261A(2)(B) "reaches a lot of speech." 37 F.4th 70, 77 (3d Cir. 2022). Jubert avers that the statute captures a "large swath of protected speech," particularly expressive online activity.

Jubert concedes that *Yung* rejected an overbreadth challenge, but notes that the court invoked a limiting construction to avoid invalidation. He criticizes that approach as inconsistent with overbreadth doctrine, which seeks to invalidate statutes that chill protected expression before narrowing constructions become necessary. *See Dombrowski v. Pfister*, 380 U.S. 479, 486–87 (1965).

Jubert also disputes that the statute's intent requirement cures the alleged overbreadth. Intent to "harass" or "intimidate," he argues, does not sufficiently cabin the statute's reach. The terms are undefined. Their scope

is uncertain. And their application, he claims, risks criminalizing speech merely because it annoys, disturbs, or offends. Again, we disagree with Jubert's theory and conclude that the statute is not overbroad.

"The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). This doctrine "is strong medicine" that should be employed "only as a last resort." *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 39 (1999) (internal quotation marks omitted). Its function "attenuates" as the regulated expression moves from "pure speech toward conduct." *Id.* at 40 (cleaned up). It serves as a judicially created tool "designed to prevent the chilling of protected expression." *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989) (plurality op.); *see generally* Lewis D. Sargentich, Note, *The First Amendment Overbreadth Doctrine*, 83 Harv. L. Rev. 844 (1970). It also addresses "threat[s] to censure comments on matters of public concern." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

This doctrine, however, is an oddity within constitutional jurisprudence. Litigants rarely have Article III standing to challenge laws merely because they "may conceivably be applied unconstitutionally to others." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973). As Professor Richard Fallon explains, "[o]utside the First Amendment context," that kind of facial challenge is understood as a matter of third-party standing or *jus tertii*. Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 859 (1991) (cleaned up). The general rule holds that unless the challenger stands in a relationship that makes the rights of others dependent on their own, one party cannot invoke hypothetical applications to avoid a lawful one. *Id.*

Courts have relaxed this standing requirement in overbreadth cases concerning the First Amendment because "statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick*, 413 U.S. at 611–12 (collecting cases). That principle reflects the "breathing space" the First Amendment requires to function in practice. *Id.* at 611.

In determining whether a statute sweeps too broadly, "we must first determine what it covers." *United States v. Hansen*, 599 U.S. 762, 770 (2023). The Supreme Court has only applied the overbreadth doctrine where there is a substantial risk that the challenged law will chill protected speech or association. *See, e.g.*, *Bigelow v. Virginia*, 421 U.S. 809, 817–18 (1975) (declining to address a facial overbreadth challenge where the statutory amendment removed the risk that the statute "will chill the rights of others"); *L. Students Civ. Rts. Rsch. Council, Inc. v. Wadmond*, 401 U.S. 154, 167 (1971) (denying facial relief where "careful administration" of the state regulatory scheme could avoid "chilling effects upon the exercise of constitutional freedoms").

Turning to the statute at issue, every federal court of appeals that has addressed a facial attack to § 2261A(2)(B) has upheld its constitutionality. *See Yung*, 37 F.4th at 81 (holding that § 2261A(2)(B) was not overbroad by applying a "limiting construction" to "save the statute"); *United States v. Fleury*, 20 F.4th 1353, 1362–63 (11th Cir. 2021) (holding that § 2261A(2)(B) is not unconstitutionally overbroad); *United States v. Ackell*, 907 F.3d 67, 73–74 (1st Cir. 2018) (same); *United States v. Gonzalez*, 905 F.3d 165, 190 n.10 (3d Cir. 2018) (same); *United States v. Petrovic*, 701 F.3d 849, 856 (8th Cir. 2012) (concluding, under the prior version of the statute, that "[m]ost, if not all, of the statute's legal applications are to conduct that is not protected by the First Amendment" (cleaned up)); *United States v. Osinger*,

753 F.3d 939, 944 (9th Cir. 2014) (rejecting an overbreadth challenge to the prior version of § 2261A(2)(B) and concluding that because the statute "proscribes harassing and intimidating conduct, the statute is not facially invalid").

Because we have not directly addressed this issue, it is one of first impression in this court. *See United States v. Conlan*, 786 F.3d 380, 385–86 (5th Cir. 2015) (holding, on plain error review, that § 2261A was not unconstitutionally vague); *accord United States v. Uhlenbrock*, 125 F.4th 217, 224 (5th Cir. 2024) ("Because Uhlenbrock does not contend that § 2261A(2)(B) is unconstitutionally overbroad, we turn to whether it is impermissibly vague."). In these instances, we are "chary to create a circuit split." *Alfaro v. Comm'r of Internal Revenue*, 349 F.3d 225, 229 (5th Cir. 2003); *see United States v. Graves*, 908 F.3d 137, 142 (5th Cir. 2018) (quoting the same).

Section 2261A(2)(B) is not facially overbroad. It prohibits repeated harassment. It targets conduct, not commentary. It punishes actions, not viewpoints. And it does so within well-established constitutional bounds. In deciding this issue, we start with what § 2261A(2)(B) covers. *See Hansen*, 599 U.S. at 770. In doing so, we begin with the text. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("As [the Supreme] Court has repeatedly stated, the text of a law controls over purported legislative intentions unmoored from any statutory text.").

Section 2261A(2)(B)'s text tells us that it only applies to "a course of conduct." Specifically, the defendant must use "the mail, any interactive computer service or electronic communication service or []system of interstate commerce, or any other facility of interstate or foreign commerce" at least twice. 18 U.S.C. § 2261A(2); *see also id.* § 2266(2) (defining "course of conduct" as a "pattern of conduct composed of 2 or more acts, evidencing

a continuity of purpose"). That narrows its reach. It excludes isolated statements and accidental communication. And it focuses the statute on persistent behavior aimed at "another person." *Id.* § 2261A(2). In *Ackell*, the First Circuit illustrated the statute's reach with examples far removed from protected speech: "[A] defendant could send envelopes of unknown white powder to the victim in the mail; he could send the victim nude photographs of herself; . . . he could open unwanted on-line dating profiles under the victim's identity." 907 F.3d at 73. The Eleventh Circuit took the same view. *See Fleury*, 20 F.4th at 1362–63. These examples are not outliers; they fall within the statute's heartland.

Moreover, a statute is not facially invalid unless it prohibits a substantial amount of protected speech judged in relation to the statute's plainly legitimate sweep. *See United States v. Williams*, 553 U.S. 285, 292 (2008) ("[W]e have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."). This one does not. So we see no reason to depart from the reasoning of our sister circuits. *See Alfaro*, 349 F.3d at 229; *Graves*, 908 F.3d at 142.

Moving on to the result element, *substantial emotional distress*, it too does not render the statute overbroad. The common law has defined this phrase for centuries. It is not standardless. "Emotional distress passes under various names," the Restatement explains, "such as mental suffering, mental anguish, [and] mental or nervous shock." RESTATEMENT (SECOND) OF TORTS § 46 cmt. j (1965). But even in tort law, "there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge." *Id.* This standard applies equally in the criminal context. *See Uhlenbrock*, 67 F.4th at 224. The statute's use of this term ensures that only serious, foreseeable harm qualifies. It excludes imagined

fear, idiosyncratic sensitivities, and emotional overreaction. That constraint makes the statute narrower, not broader.

Jubert responds that even deeply offensive speech may be protected. And he is right—but only to a point. As the Supreme Court has held, the First Amendment shields "even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011). It protects parody, even vulgar parody, of public figures. *See Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 47–48, 51 (1988). But those cases involved speech on matters of public concern—delivered in public forums, directed at public figures, and understood in a political or cultural context.

Context matters. Section 2261A(2)(B) applies to crusades of private harassment or intimidation. Of course, the First Amendment protects insults; it does not protect intimidation. "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Black*, 538 U.S. at 360; *see also NAACP. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) ("The First Amendment does not protect violence.").

The statute's mens rea element equally limits the statute's scope. The defendant must act "with the intent to . . . *harass[] [or] intimidate*." 18 U.S.C. § 2261A(2)(B) (emphasis added). That requirement does real work. "In the vast majority of its applications, [the] statute raises no constitutional problems whatever." *Williams*, 553 U.S. at 303. It protects casual speech. It protects against misunderstanding. And it reinforces that this is not a statute about expression; it is a statute about purposeful abuse. Section 2261A(2)(B) does not operate as a speech restriction, but as a buttress against insidious conduct aimed at intimidating and harassing "another person."

No. 24-60199

While the cyberstalking statute here does not define "harass" and "intimidate," that does not mean those terms are without meaning. The Third Circuit has held that "intimidate" means "a defendant must put the victim in fear of death or bodily injury." *Yung*, 37 F.4th at 80. It also held that "harass" means that the defendant "must distress the victim by threatening, intimidating, or the like." *Id.* Such a reading of these terms "limits intent to harass to 'criminal harassment, which is unprotected because it constitutes true threats or speech that is integral to proscribable criminal conduct.'" *Id.* (quoting *Ackell*, 907 F.3d at 76). It also limits the "intent to intimidate" to "a form of true threats or speech integral to a crime." *Id.* Again, we see no basis to depart from our sister circuit's reasoning. *See Graves*, 908 F.3d at 142. We therefore adopt it here. Given the foregoing reasons, we hold that § 2261A(2)(B) is not facially overbroad.

## IV

For the reasons stated herein, we AFFIRM.

15